591 S.E.2d 329

STATE of West Virginia ex rel. William R. BEIRNE, Petitioner

v.

Robert J. SMITH, Commissioner, West Virginia Bureau of Employment Programs, Respondent.

State of West Virginia ex rel. Delano Bradley, Petitioner

v.

Robert J. Smith, Commissioner, West Virginia Bureau of Employment Programs, Respondent.

Nos. 31534, 31537.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 5, 2003.

Decided Dec. 5, 2003.

Concurring Opinion of Justice Maynard Dec. 8, 2003.

McGraw, J., concurred and filed opinion.

Maynard, J., concurred and filed opinion.

Linda Garrett Dyer, Jared M. Tully, Linda Nelson Garrett, PLLC, Summersville, for William R. Beirne, Petitioner.

Thomas N. White, III, The Calwell Practice, PLLC, Charleston, for Delano Bradley, Petitioner.

Thomas J. Obrokta, Jr., Richard M. Crynock, Workers' Compensation Commission, Legal Services Division, Charleston, for Respondent.

PER CURIAM:

## I.

## FACTS

We have consolidated two cases in this opinion, because both petitioners have had their permanent total disability (sometimes abbreviated at "PTD") benefits terminated because of their age. Because these are original proceedings, we have only a limited record in each case and know little of the underlying events leading to each petitioner's injury.[1]

Delano E. Bradley has been injured in the course of his employment on several occasions. Prior to the events giving rise to this case he had received several permanent partial disability awards totaling 40 percent. Most recently, he filed a claim for permanent total disability with what was called at the time the Workers' Compensation Division.[2]

---

[1] We note that neither petitioner makes any allegation that the 1995 changes in our workers' compensation law should not apply to them because of the date of their injuries. Thus we do not address the issue in this case. *See, State ex rel. ACF Industries, Inc. v. Vieweg,* 204 W.Va. 525, 514 S.E.2d 176 (1999).

[2] The Legislature has made some changes to the organizational structure of the Workers' Compensation Program. On October 1, 2003, what was called the "Workers' Compensation Division" of the Bureau of Employment Programs became the "Workers' Compensation Commission" and is itself a separate, cabinet level commission, no longer part of the Bureau of Employment Programs. Furthermore, the former title

Mr. Bradley's claim was denied at the Division level, and he appealed to the Office of Judges. The Office of Judges reversed the Division and on January 25, 2002, granted Mr. Bradley a permanent total disability award with an "onset date" of September 19, 2000.

About five months later, on May 31, 2002, Mr. Bradley turned 65 years old. The Workers' Compensation Division notified Mr. Bradley that it was terminating his permanent total disability benefits effective June 30, 2002. Mr. Bradley avers that his lawyer contacted the Division and asked why the benefits were discontinued. Mr. Bradley claims that an employee of the Division stated that Mr. Bradley's benefits were discontinued because he had reached the age of 65, and that no written notification or explanation would be forthcoming. Mr. Bradley filed a Petition for Writ of Prohibition with this Court on July 23, 2002, and the Court issued a Rule to Show Cause on August 21, 2003.

In 1991, William R. Beirne filed a "black lung," or occupational pneumoconiosis, claim and received a permanent partial disability award of 60 percent, but continued to work until 1998—the same year that he reached age 65. In 1999, he filed another claim, and the Occupational Pneumoconiosis Board made two findings: first, that Mr. Beirne should receive an additional 40 percent permanent partial disability award, and second, that Mr. Beirne's injuries left him permanently and totally disabled. In spite of these findings, the Division sent Mr. Beirne a letter, dated January 10, 2000, stating that his injuries did make him eligible for a permanent total disability award, but because he had already reached the age of 65, the Division would not provide him with any regular cash payments.[3] The letter, without the italics we now add, stated in part:

> Accordingly it is hereby ORDERED that the claimant be granted a permanent total disability award *without indemnity payments*, with an onset date of November 5, 1998 . . . pursuant to West Virginia Code § 23-4-6(d), which states, in part, that a claimant will not be paid benefits after he, ". . . attains the age necessary to receive federal old age retirement benefits under the provisions of the Social Security Act. . . ."

It appears from the record that an award *"without indemnity payments"* means that Mr. Beirne is entitled to some medical benefits, but that he will not receive any cash payments from the Division for his injuries. Mr. Beirne filed a Petition for Writ of Mandamus with this Court on October 2, 2002, and the Court agreed to hear his case on August 18, 2003. As noted above, we have joined his claim with Mr. Bradley's, and for the reasons set forth below, we deny both writs.

## II.

### STANDARD OF REVIEW

■ Although Mr. Bradley brought his case as a petition for a writ of prohibition, while Mr. Beirne requested a writ of mandamus, we choose to treat each as a petition for a writ of mandamus, because both petitioners wish to compel the Commissioner to do an affirmative act, *i.e.*, pay benefits. *See, State ex rel. Ranger Fuel Corp. v. Lilly*, 165 W.Va. 98, 100, 267 S.E.2d 435, 436 (1980); *Carr v. Lambert*, 179 W.Va. 277, 278 n. 1, 367 S.E.2d 225, 226 n. 1 (1988), *holding modified on other grounds by State v. Macri*, 199 W.Va. 696, 487 S.E.2d 891 (1996); *State ex rel. Conley v. Hill*, 199 W.Va. 686, 687 n. 1, 487 S.E.2d 344, 345 n. 1 (1997), *overruled on other grounds by State v. Hulbert*, 209 W.Va. 217, 544 S.E.2d 919 (2001); *State ex rel. Sandy v. Johnson*, 212 W.Va. 343, 346 n. 1, 571 S.E.2d 333, 336 n. 1 (2002).

■ This Court has explained that "[m]andamus is a proper remedy to require the performance of a nondiscretionary duty

---

of "Commissioner" has been changed to "Executive Director." W. Va.Code § 23-1-1 (2003). Because this case arose under the old language, we use the old terms to avoid confusion.

3. Because both men received their injuries before reaching age 65, we are not faced in this opinion with a situation where an employee is still working after "retirement age" and is then injured, resulting in his or her permanent total disability.

by various governmental agencies or bodies." Syl. pt. 1, *State ex rel. Allstate Ins. Co. v. Union Public Service Dist.*, 151 W.Va. 207, 151 S.E.2d 102 (1966). A petitioner for a writ of mandamus must meet each element of our well-known three-part test:

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syl. pt 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969); syl. pt. 10, *State ex rel. Marockie v. Wagoner*, 191 W.Va. 458, 446 S.E.2d 680 (1994); syl. pt. 1, *Hewitt v. State Dept. of Health and Human Resources*, 212 W.Va. 698, 575 S.E.2d 308 (2002). Bearing this test in mind, we consider the arguments of the petitioners.

## III.

## DISCUSSION

■ At issue in this case is whether the Legislature violated the Equal Protection Clause of the West Virginia Constitution when it changed the law regarding permanent total disability with the following language:

> (d) For all awards of permanent total disability benefits that are made on or after the second day of February, one thousand nine hundred ninety-five, including those claims in which a request for an award was pending before the division or which were in litigation but not yet submitted for a decision [4], then benefits shall be payable until the claimant attains the age necessary to receive federal old age retirement benefits under the provisions of the Social Security Act, 42 U.S.C. § 401 and 402, in effect on the effective date of this section.

W. Va.Code § 23-4-6(d) (1995).[5]

■ As we have often stated, we begin any analysis of a workers' compensation case with a recognition of the remedial nature of the program: "The Workmen's Compensation Law is remedial in its nature, and must be given a liberal construction to accomplish the purpose intended." Syl. pt. 3, *McVey v. Chesapeake & Potomac Telephone Co.*, 103 W.Va. 519, 138 S.E. 97 (1927) (citation omitted); syl. pt. 1, *Plummer v. Workers' Compensation Division*, 209 W.Va. 710, 551 S.E.2d 46 (2001); syl. pt. 1, *Repass v. Workers' Compensation Division*, 212 W.Va. 86, 569 S.E.2d 162 (2002).[6]

■ However, at the same time we must acknowledge that our workers' compensation scheme is a creature of statute, created by and at the mercy of the Legislature:

> The ultimate responsibility for the fiscal health of the West Virginia Workers' Compensation system rests with the Legislature. Balancing the conflicting goals of minimizing premiums while providing full and fair compensation to injured workers is the exclusive province of our publicly elected legislators, and is not to be invaded by the Commissioner, or the Courts.

Syl. pt. 3, *Repass v. Workers' Compensation Division*, 212 W.Va. 86, 569 S.E.2d 162 (2002).

The central issue in this case is whether or not the Legislature can decide to terminate workers' compensation benefits for permanently and totally disabled workers simply

---

**4.** This Court has previously discussed the effective date of the 1995 changes in *Blankenship v. Richardson*, 196 W.Va. 726, 474 S.E.2d 906(1996). The Court has also held that the date of injury or last exposure, not the date of filing or date of the award, determines whether or not these changes in the law apply to a given claimant. "[T]he employee's application for such compensation is governed by the statutory, regulatory, and common law as it existed on the date of the employee's injury or last exposure...." Syl. pt. 8, *in part, State ex rel. ACF Industries, Inc. v. Vieweg*, 204 W.Va. 525, 514 S.E.2d 176

(1999). We need not address this issue in the instant case.

**5.** The claims in this case are governed by the 1995 changes to the statute. We realize that the legislature made significant changes to our workers' compensation law in 2003; however, those changes are not at issue in this opinion.

**6.** This opinion does not address recent legislative changes that purport to eliminate the so-called "rule of liberality."

because they have reached age 65.[7] It is our unfortunate conclusion that the Legislature has this authority. Although the result of the Legislature's decision to cut off benefits at age 65 will be to further impoverish some of our poorest citizens, it is within the prerogative of the Legislature to limit these benefits in its efforts to preserve the fund for future claims.

■ The briefs in this case reflect the current public debate about the huge deficits faced by the fund—a number which changes often, but always in an upward direction. However, it is important to remember that the purpose of the fund is not to offer low premiums in order to please business interests; the purpose of the fund is to compensate injured workers, many of whom have lost limbs, or been blinded, deafened, or paralyzed for the rest of their lives.

> The Act is designed to compensate injured workers as speedily and expeditiously as possible in order that injured workers and those who depend upon them for support shall not be left destitute during a period of disability. The benefits of this system accrue both to the employer, who is relieved from common-law tort liability for negligently inflicted injuries, and to the employee, who is assured prompt payment of benefits.

*Meadows v. Lewis,* 172 W.Va. 457, 469, 307 S.E.2d 625, 638 (1983); *Repass v. Workers' Compensation Division,* 212 W.Va. 86, 92–93, 569 S.E.2d 162, 168–69 (2002). None should lose sight of the fact that this system benefits the *employers* as well as the injured employees.

Of late, the loudest voices decry the burden the system places upon business, and many intimate that workers' compensation is really some kind of confidence game foisted upon the employers and the public by scheming and artful employees. While this might be a magnificent public relations victory for those who share that belief, it is not an accurate depiction of our system. As one scholar has noted, it is more fashionable now to blame the workers for whatever problems a state fund might have:

> Weeding out "epidemic" or "rampant" worker claims fraud is all the rage, spreading nationally with that hollow but happy sound because, after all, nobody favors fraud. Many states have enacted tougher penalties for fraud and have established fraud investigation units [however]. . . . The fervor to root out worker fraud is unmatched by efforts to investigate employer fraud, who misrepresent job classifications and payroll or illegitimately employ "independent contractors."

Dean J. Haas, *Falling Down on the Job: Workers' Compensation Shifts From a No-fault To a Worker-fault Paradigm,* 79 N.D. L. Rev. 203, 287 (2003) (footnotes omitted).

And this Court itself has noted that no honest critic can honestly blame the. fund's financial woes entirely upon the injured workers:

> The unfunded liability of the Workers' Compensation Fund is ultimately the result of the failure to collect adequate premiums in order to fund the promises made to pay benefits to workers. Notably and *indisputably,* the premium levels charged to subscribing employers in West Virginia have been comparatively low since the mid–1980s, when compared nationally or within this region. In 1985, the Moore Administration chose to reduce premium rates by 30 percent and to freeze the premiums at this unsound—and illegal—level. Premium rates were not adjusted until 1989. While premium levels all over the country rose dramatically from 1985 to 1990, West Virginia's premium rates were artificially suppressed.

*Repass v. Workers' Compensation Division,* 212 W.Va. 86, 103–04 n. 15, 569 S.E.2d 162, 179–80 n. 15 (2002) (quoting, Emily A. Spieler, *Assessing Fairness in Workers' Compensation Reform: A Commentary on the 1995 West Virginia Workers' Compensation Legislation,* 98 W. Va. L. Rev. 23, 84–85 (1995) (footnotes omitted) (emphasis in original)).

**7.** The statute is couched in terms of reaching "the age necessary to receive federal old age retirement benefits under the provisions of the Social Security Act . . . ," which is currently age 65 for those reaching that age today, but will rise over time.

Reasonable minds may differ as to whether the Legislature has chosen a fair or effective method of improving the solvency of the fund by limiting benefits for elderly claimants—that is not a question this Court attempts to answer. The question asked of this Court today is whether W. Va.Code 23–4–6(d) (1995) violates our Constitution by cutting off permanent total disability benefits for those reaching the federal retirement age.[8] In a recent case in which the Court considered the constitutionality of a somewhat similar Code provision, the Court explained:

> Where economic rights are concerned, we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally. Where such classification is rational and bears the requisite reasonable relationship, the statute does not violate Section 10 of Article III of the West Virginia Constitution, which is our equal protection clause.

Syl. pt. 2, *State ex rel. Boan v. Richardson*, 198 W.Va. 545, 482 S.E.2d 162 (1996) (as modified); *accord;* syl. pt. 7, *Atchinson v. Erwin*, 172 W.Va. 8, 302 S.E.2d 78 (1983); syl. pt. 4, *Hartsock–Flesher Candy Co. v. Wheeling Wholesale Grocery Co.*, 174 W.Va. 538, 328 S.E.2d 144 (1984); syl. pt. 4, *Gibson v. West Virginia Department of Highways*, 185 W.Va. 214, 406 S.E.2d 440 (1991); syl. pt. 2, *Robinson v. Charleston Area Medical Center*, 186 W.Va. 720, 414 S.E.2d 877 (1991); syl. pt. 2, *E.H. v. Matin*, 189 W.Va. 102, 428 S.E.2d 523 (1993). Thus, in other words, W. Va.Code 23–4–6(d) (1995) must bear a reasonable relationship to a proper governmental purpose and must treat equally all persons in the class it creates.

In *Boan*, the Court considered W. Va.Code § 23–4–23 (1994), which mandated a "reduction of permanent total disability benefits under workers' compensation by one-half of the sum of old age social security insurance payable to a claimant." *Id.* 198 W.Va. at 547, 482 S.E.2d at 164.[9] Thus, the statute at issue in *Boan* affected permanent total disability recipients who were also *receiving* social security retirement benefits. The Commissioner had argued in *Boan* that the primary purpose for making this reduction was to avoid duplication of benefits. First, the Court compared permanent total disability benefits with social security retirement benefits and refuted the state's argument that permanent total disability benefits were merely a wage replacement scheme:

> Permanent total disability awarded under workers' compensation is part of a comprehensive plan designed to rectify the results of an injury in the workplace. The payments to the claimants and other benefits are in lieu of such elements of damage in the common law tort system as lost wages, lost earning capacity, reimbursement of past and future medical expenses, past and present pain and suffering, emotional distress, and other factors.

*Id.* 198 W.Va. at 548, 482 S.E.2d at 165 (citations omitted). The Court continued by saying: "Social security old age insurance benefits, on the other hand, are retirement benefits earned by continued employment in the work force and the attainment of the age of sixty-two or sixty-five or older." *Id.* 198 W.Va. at 549, 482 S.E.2d at 166 (footnote and citations omitted). The Court concluded that, "our workers' compensation benefits for permanent total disability are more than simply a wage replacement system." *Id.* 198 W.Va. at 550, 482 S.E.2d at 167. Because the *Boan* Court rejected the state's argu-

---

**8.** We use the terms "old age retirement benefits" and "social security benefits" in this opinion to refer to those payments made by the federal government to eligible recipients based upon age. We do not address any other form of so-called "social security benefits," such as social security disability benefits, in this opinion.

**9.** It appears that the 1994 version of W. Va.Code § 23–4–23 found unconstitutional in *Boan* re-

mained in the Code until recently. However, the Division argues that it stopped paying benefits to Mr. Beirne and Mr. Bradley under the authority of W. Va. § 23–4–6(d) (1995), thus the Division never attempted to apply W. Va.Code § 23–4–23 (1994), so it is not at issue in this case. We note that the 2003 version of W. Va.Code § 23–4–23 no longer contains the language at issue in *Boan*.

ment that the two programs duplicated one another, the Court held, in part,

> ... We conclude that the statute is defective in creating the classification of "old age social security recipient" and reducing benefits for those persons, [and] that such classification, as here applied, bears no reasonable relationship to a proper governmental purpose of avoiding duplication of benefits. . . .

*Id.*, at syl. pt. 2.[10] What we glean from *Boan* is that permanent total disability benefits and social security retirement benefits are not the same. Therefore, the statute in that case was unconstitutional because its procedure (reducing permanent total disability benefits for those who received social security benefits) bore no reasonable relationship to its avowed purpose (avoidance of benefit duplication).

In this case, the petitioners argue the same logic should apply to the statute at issue. The Commissioner argues that the statute at issue is not constitutionally defective like the one in *Boan*, first, because it has a different purpose, protecting the solvency of the fund, and second, because its procedure, cutting off every injured person who reaches retirement age, is reasonably related to this purpose. We are begrudgingly persuaded that this position is correct.

The new language casts a wide net, depriving all who won their permanent total disability claims after the effective date of the statute of all cash benefits upon reaching retirement age. Thus, unlike the statute in *Boan*, it makes no distinction between those receiving social security and those who are

not; it simply cuts off cash payments to all affected recipients. And unlike the statute in *Boan*, it also bears a reasonable relationship to the avowed purpose; cutting off these beneficiaries as they reach retirement age will no doubt somewhat reduce the expenses of the fund, making it somewhat more solvent than it would otherwise be.

We note that several other states have adopted a similar, draconian strategy of reducing or cutting off benefits for elderly recipients of permanent total disability awards. These states include, but are not limited to, Connecticut (benefits reduced if workers also receives old age benefits C.G.S.A. § 31–307(e) (1993); *Rayhall v. Akim Co., Inc.*, 263 Conn. 328, 819 A.2d 803 (2003)); Florida (benefits cease at age 75 unless the employee is not entitled to social security benefits, and if employee is injured after age 70 he/she is still entitled to five years of benefits—F.S.A. § 440.15), Kentucky (benefits reduced—K.R.S. § 342.730(4); *McDowell v. Jackson Energy*, 84 S.W.3d 71 (Ky.2002)); Kansas (benefits offset—*Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 942 P.2d 591 (1997)); Maine (benefits reduced by 50 percent of social security retirement benefits—*Berry v. H.R. Beal & Sons*, 649 A.2d 1101 (Me.1994)); and Tennessee (benefits terminate upon reaching retirement age, but any employee injured after age 60 still can still receive 260 weeks of benefits—T.C.A. § 50–6–207(4)(A)(i) (1999); *McCoy v. .T.T.C., Illinois Inc.*, 14 S.W.3d 734 (Tenn.2000)).[11]

■ In light of this authority, although many might not believe that cutting off benefits to elderly, injured workers is the best

---

**10.** The full text of the syllabus point reads:

> West Virginia Code § 23–4–23 (1994) violates Art. III, § 10 of the West Virginia State Constitution in that it fails to provide the equal protection of the Workers' Compensation Act to old age social security recipients who may have been, or may be, injured in their employment and are thereby permanently and totally disabled within the meaning of our Workers' Compensation Act. We conclude that the statute is defective in creating the classification of "old age social security recipient" and reducing benefits for those persons, that such classification, as here applied, bears no reasonable relationship to a proper governmental purpose of avoiding duplication of benefits, and that it

results in all persons within the class of "old age social security recipients" not being treated equally.

*Id.* We do not address the second issue raised in the syllabus point, which concerned the payment of permanent partial disability benefits, but not permanent total disability benefits, to injured workers who were also social security recipients.

**11.** After reviewing the polices of some of these states, one might argue that the language struck down in *Boan*, which mandated a reduction in disability payments, rather than their complete elimination, would be preferable to the language of W. Va.Code § 23–4–6(d) (1995), and might withstand scrutiny if tied to the governmental purpose identified in this case.

possible solution to the fund's financial woes, we believe the Legislature has the authority to take this action:

> Though we may believe the legislature's actions are harsh or even cruel, or sound economic policy, its policy decisions, under our constitutional framework, are its own, subjecting it to the scrutiny of the electorate in whose hands the constitution vests the ultimate reviewing authority.

*Blankenship v. Richardson*, 196 W.Va. 726, 737, 474 S.E.2d 906, 917 (1996). Furthermore, we believe that the action taken by the Legislature in limiting benefits under W. Va. Code § 23–4–6(d) creates a "classification [that] is a rational one based on social, economic, historic or geographic factors, [and it] bears a reasonable relationship to a proper governmental purpose." *State ex rel. Boan v. Richardson*, 198 W.Va. 545, 482 S.E.2d 162 (1996).

Therefore, we conclude that W. Va.Code § 23–4–6 (1995), which cuts off cash payments for elderly, permanently disabled workers once they "attain[ ] the age necessary to receive federal old age retirement benefits" does not violate Section 10 of Article III of the West Virginia Constitution. As a result, the petitioners do not have "a clear legal right ... to the relief sought; [nor is there] a legal duty on the part of respondent to do the thing which [each] petitioner seeks to compel." *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969).

In conclusion we note that those who are unhappy with such a state of affairs must understand that it is their publicly elected representatives who have decided to terminate all cash compensation [12] to these elderly individuals who were injured so severely at work that they are totally and permanently disabled. This rule is "a statutory creature, created and refined by the Legislature," *State ex rel. ACF Industries, Inc. v. Vieweg*, 204 W.Va. 525, 543, 514 S.E.2d 176, 191 (1999), and is not a product of our courts.

## IV.

### CONCLUSION

For the reasons stated, the we deny the requested writs of mandamus.

Writs denied.

Justice McGRAW and Justice MAYNARD, concur and file concurring opinions.

McGRAW, J., concurring:

The Workers' Compensation Fund has been the victim of years of neglect and mismanagement. The Fund has long been subject to the pressure of past executives who, in an effort to keep their jobs, curried favor with large, primarily out-of-state interests by lowering premiums on the most dangerous occupations.

Our workers' compensation system has always been based on the faith that there will be sufficient reserves in the Fund, and sufficient economic activity in the future to continuing paying for the injuries of the past. But this faith has failed us. It has failed us in part because our state government has kowtowed to special interests by keeping premiums artificially low, and in part because we are poorly served by a national government that aids and abets large corporations in sending our jobs overseas. Mines close, factories are shuttered, but the injured workers remain, and the cost of their injures is thrust upon the public and our small business community.

Instead of focusing upon the past abuses that have produced our current, sorry state of affairs, the media often blames this Court for thwarting any effort to improve the solvency of the Fund. Today the Court approves the Legislature's decision to cease permanent total disability benefits to those recipients who reach federal retirement age. However, it should be clear to all that it was the decision of the Legislature, and not this Court, to balance the Fund's checkbook on the broken backs of these injured, elderly

---

**12.** The Commissioner points out that elderly permanent total disability beneficiaries can still have their injury-related medical bills paid, but they will no longer receive regular cash payments from the fund.

workers; and it is to the Legislature that the aggrieved must look for answers.

Therefore, I must reluctantly concur.

MAYNARD, Justice, concurring.

I concur wholeheartedly to the findings and the results in these cases. That is, I agree that the Legislature did not violate the Equal Protection Clause of the West Virginia Constitution when it provided that PTD benefits shall be payable until the claimant attains the age necessary to receive federal old age retirement benefits under the Social Security Act. I write separately, however, because I do not agree with many of the sentiments expressed in this opinion.

Unlike the majority, I do not consider the legislation at issue to be "draconian." Op. at 13, 591 S.E.2d at 336. I also do not believe that the result of the Legislature's decision to cut off benefits at age 65 "will be to further impoverish some of our poorest citizens[.]" Op. at 7, 591 S.E.2d at 334. My belief, which may not hold true in every case, is that the source of the money paid to retirees simply will change from the Workers' Compensation fund to the Social Security system and other retirement funds, just like it does for most working people when they retire. In other words, when a person retires, he or she goes off the employer's payroll and begins to receive Social Security and/or other retirement plans.

Further, the provision at issue is not unique. Several states cease payment of PTD benefits at a certain age or when the claimant becomes eligible for Social Security retirement benefits including Kentucky, Tennessee, Minnesota, Montana, and North Dakota. Several other states, including Alaska, Colorado, Connecticut, Florida, Kansas, Louisiana, Ohio, Oregon, Pennsylvania, South Dakota, and Washington,[1] make PTD benefits subject to Social Security benefit offsets.

The majority asserts that the question whether the Legislature has chosen a fair or effective method of improving the solvency of the fund by limiting benefits to elderly claimants is not a question this Court attempts to answer. The majority then proceeds to answer this question with some criticism of the legislation. I do not join in this criticism. While I am not sure there is any fair way to improve the solvency of the fund, I believe the Legislature has chosen an effective, but perhaps unfortunate, method of attempting to do so.

In contrast to the majority, I have no desire to be critical of the Legislature for making the tough choices necessary to help repair a badly broken system. Frankly, there is no easy answer to our workers' compensation problem. No doubt, many other changes will have to be made in our compensation system in the future to make it solvent, and none of them likely will be easy or pleasant. I wish as much as the majority does that no injured worker would suffer any benefit reduction of any kind. Also, unlike the majority, my vote to find the subject legislation constitutionally permissible was not cast begrudgingly. If a statute is constitutional, it is our constitutional duty to uphold it. While one may dislike some statutes, and we all have some we dislike, we have no choice but to comply with them.

For these reasons, I concur in the ultimate result reached by the majority.

---

1. *See* 10 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law*, Appendix B, Table 7 (November 2003).