IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

**FILED**

**June 3, 2016**

**released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 15-0524

KAREN ADAMS,

Petitioner/Petitioner Below

v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY
d/b/a American Education Services, a foreign corporation,

Respondent/Defendant Below

Appeal from the Circuit Court of Putnam County
The Honorable Phillip Stowers, Judge
Civil Action No. 12-C-43

AFFIRMED

Submitted:  April 27, 2016
Filed:  June 3, 2016

John H. Skaggs, Esq.                      Steven L. Thomas, Esq.
THE CALWELL PRACTICE, LC                  Charles W. Pace, Jr., Esq.
Charleston, West Virginia                 KAY CASTO & CHANEY PLLC
Attorney for Petitioner                   Charleston, West Virginia
                                          Attorney for Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.
CHIEF JUSTICE KETCHUM concurs, in part, and dissents, in part, and reserves the
right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review."  Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

2.      "Preemption is a question of law reviewed *de novo*."  Syl. Pt. 1, *Morgan v. Ford Motor Co.*, 224 W. Va. 62, 680 S.E.2d 77 (2009).

3.      "Although there can be no crystal-clear, distinctly-marked formula for determining whether a state statute is preempted, there are two ways in which preemption may be accomplished: expressly or impliedly."  Syl. Pt. 5, *Morgan v. Ford Motor Co.*, 224 W. Va. 62, 680 S.E.2d 77 (2009).

4.      "There are two recognized types of implied preemption: field preemption and conflict preemption. . . . Implied conflict preemption occurs where compliance with both federal and state regulations is physically impossible, or where the state regulation is an obstacle to the accomplishment or execution of congressional objectives.  Syl. Pt. 7, *Morgan v. Ford Motor Co.*, 224 W. Va. 62, 680 S.E.2d 77 (2009).

i

5.     A claim pursuant to West Virginia Code § 46A-2-128(e) for unlawful communications regarding a debt is preempted by the federal regulations governing administration of Federal Family Education Loan Program loans as set forth in Title 34, Part 682 of the Code of Federal Regulations.

6.     "Roughly stated, a 'genuine issue' for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed 'material' facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law."  Syl. Pt. 5, *Jividen v. Law*, 194 W. Va. 705, 461 S.E.2d 451 (1995).

WORKMAN, Justice:

This is an appeal from the February 3, 2015,[1] order of the Circuit Court of Putnam County granting respondent Pennsylvania Higher Education Assistance Agency's (hereinafter "PHEAA") motion for summary judgment. The circuit court found that PHEAA's debt collection activity is required by the Federal Family Education Loan Program (hereinafter "FFELP") regulations promulgated pursuant to the Higher Education Act of 1965 (hereinafter "HEA") and; therefore, petitioner Karen Adams' (hereinafter "petitioner") West Virginia Consumer Credit and Protection Act (hereinafter "WVCCPA") claim is preempted by federal law.

Based upon our review of the briefs, legal authorities, appendix record, and upon consideration of arguments of counsel, we find that petitioner's cause of action is, in part, preempted by federal law and that the remainder of her claims do not survive summary judgment. We therefore affirm the circuit court's order awarding summary judgment in favor of PHEAA.

## I.    FACTS AND PROCEDURAL HISTORY

Petitioner was born and raised in Lakeland, Florida, where she dropped out of school in the 11th grade. She remained in the Florida area until 1992, when she moved to West Virginia. Petitioner is currently receiving social security disability on the

---

[1] On April 30, 2015, the circuit court re-entered the order granting summary judgment for purposes of appellate review inasmuch as the circuit clerk failed to provide copies to counsel of record.

basis of severe hypertension, migraine headaches, and mild mental retardation with marginal illiteracy. In approximately 2007, petitioner began receiving phone calls from a collection agency regarding a guaranteed student loan ("GSL") procured in her name over twenty years prior on November 9, 1986, from Florida Federal Savings & Loan, Inc. in the amount of $2,500.00 for the purpose of attending PTC Institute in Florida.[2] Petitioner denied entering into any such loan agreement, executing an application or promissory note bearing her name, or attending college or vocational training.

Notwithstanding her disavowal of the loan, petitioner entered into a "rehabilitation agreement," wherein she agreed to make nine payments of $86.00/month to remove the "default" status of the loan, which was then owned by the Department of Education as a federally guaranteed Robert T. Stafford Federal Loan. In 2007, the loan was sold in a bundle by the Department of Education to SunTrust Bank, at which time PHEAA became the loan servicer. From June, 2008, to March, 2010, petitioner made twenty-one additional payments on the rehabilitated loan. Petitioner maintains that she entered such rehabilitation agreement because the loan servicers threatened to take her social security if she did not make payments.

In or around June, 2010, petitioner again began to disavow the loan, claiming identity theft with regard to the loan application and promissory note. An

---

[2] PTC Institute is now defunct.

2

investigation was launched by PHEAA during which petitioner submitted handwriting samples which were determined by PHEAA to have "similar characteristics" to the signature on the loan documentation. An investigator for PHEAA scheduled a meeting with petitioner to facilitate the completion of a police report; before the meeting commenced, petitioner asked the investigator what the penalty would be for filing a false report and indicated instead that she would take responsibility for the loan and pay off the balance.[3]

After the identity theft investigation was closed, in April, 2011, petitioner began to assert that she was entitled to discharge of the loan because she was disabled. Petitioner submitted her social security award decision in aid of a disability discharge of her loan, but failed to produce a signed physician's report of disability, as required. She retained counsel shortly thereafter; however, PHEAA continued its collection efforts including written and telephone contact with petitioner.

Petitioner filed the instant lawsuit seeking a declaratory judgment that the loan and rehabilitation agreement were "null and void"[4] and damages under the

---

[3] At this juncture, however, petitioner appears to retreat from her identity theft claim. Petitioner's brief states "[i]t may be [petitioner] signed the forms" and that petitioner "with her impairments characterized what happened to her as identity theft."

[4] Petitioner also sought a declaration that efforts to collect the debt were barred by a five-year statute of limitations. Petitioner appears to have abandoned such argument in light of her citation of 20 U.S.C. § 1091a, which preempts statutes of limitations in actions to collect delinquent federal student loans. Section 1091a(a)(1) states "[i]t is the (continued . . .)

WVCCPA.[5]   After the commencement of this litigation, petitioner received correspondence from Education Credit Management Corp. (hereinafter "ECMC"), the loan guarantor, stating that her loan was eligible for an administrative discharge under the "ability to benefit" regulations,[6] as long as she had not graduated high school nor obtained a GED.   Apparently, in 1995, the Department of Education had rendered a "blanket discharge" of loans for attendance at PTC Institute entered into from January 1, 1986 through June 30, 1990 for systematic violation of the "ability to benefit" regulations.   As a result, petitioner executed an application for discharge in which she swore, under penalty of perjury, that she attended PTC Institute from December 30, 1986

---

purpose of this subsection to ensure that obligations to repay loans and grant overpayments are enforced without regard to any Federal or State statutory, regulatory, or administrative limitation on the period within which debts may be enforced."

[5] It appears from the docket sheet included in the appendix record that petitioner filed three amended complaints, although only one is included in the record.  The third amended complaint (improperly captioned "second amended complaint") included in the record also names SunTrust Bank, Collectcorp, and ECMC as defendants.  It further appears from the record that petitioner served and settled with SunTrust Bank, but did not serve Collectcorp and ECMC.  Moreover, the third amended complaint contained in the record appears to have been withdrawn before the circuit court granted leave to amend. Accordingly, the complaint under which the parties were operating at the time summary judgment was granted—the second amended complaint—is not apparently contained in the record.

[6] To be eligible for a federal GSL, an applicant must demonstrate an "ability to benefit" from the education sought by possessing certain minimal requirements as discussed more fully *infra*.  The Department of Education found that PTC Institute fraudulently certified that students had the ability to benefit from its programs from 1986-1990.

to June 16, 1987, [7] and that federally guaranteed student loan funds were issued to her or for her benefit while attending PTC. Accordingly, her loan was discharged and all payments she made were refunded.

PHEAA moved for summary judgment, presumably arguing that petitioner's claims under the WVCCPA were preempted by the FFELP regulations.[8] The circuit court agreed, finding that the FFELP regulations "provide a detailed statutory and regulatory governance structure for Federally-insured student loans," which includes "minimum uniform due diligence requirements for loan collections[.]" Citing 34 Code of Federal Regulations section 682.411(o), which states that the FFELP regulations "preempt any State law, including State statutes, regulations, or rules, that would conflict with or hinder satisfaction of the requirements or frustrate the purposes of this section," the circuit court found that the portions of the WVCCPA upon which petitioner relied were in conflict with and therefore preempted by federal law. Finding further that petitioner had afforded herself of the administrative remedies provided by HEA and FFELP regulations, the circuit court concluded that no further remedy was available to her. This appeal followed.

---

[7] These dates were pre-populated into the application by ECMC.

[8] Neither the motion for summary judgment, response, reply, nor any hearing transcript is contained in the appendix record.

5

## II.     STANDARD OF REVIEW

This Court has held that

> [i]n reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997). Moreover, inasmuch as the circuit court granted summary judgment on the basis of preemption, we have further held that "[p]reemption is a question of law reviewed *de novo*." Syl. Pt. 1, *Morgan v. Ford Motor Co.*, 224 W. Va. 62, 680 S.E.2d 77 (2009). With these standards in mind, we proceed to the parties' arguments.

## III.     DISCUSSION

This case requires the Court to determine whether petitioner's WVCCPA claims are preempted by the regulations promulgated under the FFELP of the HEA. In general, petitioner argues that any federal preemption as to debt collection practices does not apply where the loan was invalid at the outset. In response, PHEAA argues that its collection efforts are federally mandated and that the blanket discharge for petitioner's loan merely made it "dischargeable" upon proper application. PHEAA argues strenuously that petitioner's assertions that she did not apply for or accept the loan have

been rendered immaterial in light of her sworn affirmation in the discharge application that she received the funds or they were disbursed for her benefit.

Title IV of the Higher Education Act of 1965 created the Federal Family Education Loan Program, which is codified at 20 U.S.C. §§ 1071 to 1087-4, as amended. This program has been well-summarized as follows:

> Pursuant to the FFEL programs, students attending eligible postsecondary schools may borrow money for tuition and expenses from participating lenders, such as banks. These loans are insured by participating "guaranty agencies" which, in turn, are reinsured by the Department of Education. If a student fails to repay a FFEL loan, the lender submits all relevant records to the guaranty agency and requests reimbursement. 20 U.S.C. § 1078(b)-(c). *If the guaranty agency determines that servicing and collection efforts have been properly performed by the lender,* it repays the lender for the outstanding balance on the loan. 34 C.F.R. §§ 682.406(a)(1) and (3). The guaranty agency then undertakes collection efforts of its own, 34 C.F.R. § 682.410(b)(4), and, if these are unsuccessful, obtains repayment from the Department of Education. 20 U.S.C. § 1078(c); 34 C.F.R. §§ 682.100 and 682.404.

*Calise Beauty Sch., Inc. v. Riley*, 941 F. Supp. 425, 427 (S.D.N.Y. 1996) (emphasis added). The purposes of the FFELP are to "(1) enable the Secretary of Education to encourage lenders to make student loans; (2) provide student loans to those students who might not otherwise have access to funds; (3) pay a portion of the interest on student loans; and (4) guarantee lenders against losses." *McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217, 1224 (11th Cir. 2002).

7

Before reaching the issue of the preemption of petitioner's claims, it is important to note that it is well-established that there is no private cause of action under the FFELP regulations. *See Labickas v. Arkansas State Univ.*, 78 F.3d 333, 334 (8th Cir. 1996) ("[N]o private right of action is implied under the HEA for student borrowers."); *L'ggrke v. Benkula*, 966 F.2d 1346 (10th Cir. 1992) (finding no private right of action for student borrowers). Moreover, petitioners make no claim under the federal Fair Debt Collection Practices Act (hereinafter "FDCPA").[9] Instead, petitioner's sole claims involve the WVCCPA. First, petitioner alleges that PHEAA violated West Virginia Code § 46A-2-128(e) (1990), which provides:

> [n]o debt collector shall use unfair or unconscionable means to collect or attempt to collect any claim. . . . .[T]he following conduct is deemed to violate this section:
>
> (e) Any communication with a consumer whenever it appears that the consumer is represented by an attorney and the attorney's name and address are known . . . .

Petitioner claims that PHEAA's continued contact with her after she advised she was represented by counsel violates this section. Secondly, petitioner alleges that PHEAA violated West Virginia Code § 46A-2-127(d) (1997),[10] which provides:

---

[9] However, in two of her assignments of error, petitioner characterizes her claims as being under the FDCPA and discusses the Act in her brief. While a cause of action for violation of the FDCPA premised on collection activity under FFELP is permissible, there is no question that petitioner pled no such claim in her complaint. Counsel further indicated during oral argument that these references were "misnomers."

[10] Neither complaint provided in the appendix record contains any allegation of violation of this provision of the WVCCPA. Both complaints reference only West Virginia Code § 46A-2-128(e). As discussed in n.5, *supra*, the complaint under which (continued . . .)

8

[n]o debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims . . . . [T]he following conduct is deemed to violate this section:

(d) Any false representation or implication of the character, extent or amount of a claim against a consumer, or of its status in any legal proceeding;

Petitioner claims that PHEAA's attempt to collect the loan "without confirming that the original loan had in fact been disbursed" and/or was "enforceable" violates this section.

With respect to preemption in general, this Court has held that "[a]lthough there can be no crystal-clear, distinctly-marked formula for determining whether a state statute is preempted, there are two ways in which preemption may be accomplished: expressly or impliedly." Syl. Pt. 5, *Morgan*, 224 W. Va. 62, 680 S.E.2d 77. Further,

[t]here are two recognized types of implied preemption: field preemption and conflict preemption. . . . Implied conflict preemption occurs where compliance with both federal and state regulations is physically impossible, or where the state regulation is an obstacle to the accomplishment or execution of congressional objectives.

Syl. Pt. 7, *Id.* "A state law may pose an obstacle to federal purposes by interfering with the accomplishment of Congress's actual objectives, or by interfering with the *methods* that Congress selected for meeting those legislative goals." *Coll. Loan Corp. v. SLM*

---

the parties were operating upon entry of summary judgment does not appear to be contained in the appendix record. However, PHEAA does not challenge this claim on the basis that it was not sufficiently alleged in the complaint; therefore, we will accept petitioner's characterization of her claim under this section as having been adequately pled for purposes of our analysis.

9

*Corp.*, 396 F.3d 588, 596 (4th Cir. 2005) (citing *Gade v. Nat'l Solid Waste Mgmt. Assoc.*, 505 U.S. 88, 103 (1992)). The parties appear to agree that this case involves implied conflict preemption. However, we are mindful that "[o]ur law has a general bias against preemption[.]" *Gen. Motors Corp. v. Smith,* 216 W.Va. 78, 83, 602 S.E.2d 521, 526 (2004). "[B]oth this Court and the U.S. Supreme Court have explained that federal preemption of state court authority is generally the exception, and not the rule." *In re: W. Va. Asbestos Litig.,* 215 W.Va. 39, 42, 592 S.E.2d 818, 821 (2003).

With respect specifically to preemption of state consumer credit acts by the FFELP regulations, there appears to be two approaches taken by courts. Some courts have found preemption of state consumer credit acts on a broad, act-wide basis. In *Brannan v. United Student Aid Funds, Inc.,* 94 F.3d 1260, 1266 (9th Cir. 1996), the Ninth Circuit found preemption of the entire Oregon consumer protection act, concluding that the act "consists of nothing but prohibitions, restrictions and burdens on collection activity[.]" The Ninth Circuit reasoned that "[i]f student loan guarantors were exposed to liability under fifty different sets of statutes, regulations and case law, conducting diligent pre-litigation collection activity could be an extremely uncertain and risky enterprise." *Id.* at 1264. Accordingly, the Ninth Circuit found that the available remedy under the FDCPA was sufficient to protect borrowers from unlawful collection activity and that state-level consumer credit protection claims were preempted. *Id.* at 1266.

10

Other courts, however, have chosen to examine each specific claim alleged to determine if it frustrates the purpose of the regulations. Rejecting the *Brannan* court's wholesale preemption approach, the court in *Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113, 1129 (11th Cir. 2004) rejected preemption of an "*entire* state statute . . . because *some* of its provisions may actually conflict with federal law." (emphasis added). *See also Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015) (finding state law breach of contract claim did not conflict with or hinder satisfaction of regulations).

Federal district courts within West Virginia are likewise divided in their approach. In the Southern District, courts have refused to find that the FFELP regulations completely preempt the WVCCPA, analyzing preemption on a claim-by-claim basis. *See McComas v. Fin. Collection Agencies, Inc.*, No. 2:96-0431, 1997 WL 118417, at *3 (S.D.W. Va. Mar. 7, 1997) (finding no preemption under particular claim alleged because FFELP regulations mandating telephone contacts do not give license to "use abusive or deceptive methods"); *Snuffer v. Great Lakes Educ. Loan Servs, Inc.*, 97 F. Supp.3d 827, 832 (S.D. W. Va. 2015) (recognizing certain conflicts in WVCCPA but finding no preemption because "barring threatening or fraudulent . . . practices cannot be said to place a 'burden' on pre-litigation debt collection" under the FFELP regulations); *Martin v. Sallie Mae, Inc.*, No. 5:07-cv-00123, 2007 WL 4305607 (S.D.W. Va. Dec. 7, 2007) (finding preemption only with respect to particular claims alleged). However, the Northern District has found complete preemption of the WVCCPA by FFELP

11

regulations. *See Seals v. Nat'l Student Loan Program*, No. 5:02-cv-101, 2004 WL 3314948 (N.D. W. Va. Aug. 16, 2004) (relying on *Brannan*, *supra*).

In light of the strong presumption against preemption, we find the most reasoned approach is to analyze the particular provisions or claims made under state law to determine if each conflict with and are therefore preempted by federal law. While the WVCCPA does place certain constraints on debt collection activity, some of those constraints render certain actions unlawful on a public policy basis only, while others are inherently wrongful.[11] To summarily conclude that all of these prohibited practices, regardless of their nature, burden or hinder the purposes behind the FFELP regulations elevates form over substance and runs contrary to our established preemption analysis.

A.    *Preemption of Claim Pursuant to West Virginia Code § 46A-2-128(e) Alleging Prohibited Telephone Contact*

We therefore begin with petitioner's claim, pursuant to the WVCCPA, that PHEAA's continued communication with her after it was advised that she was represented by counsel violated West Virginia Code § 46A-2-128(e). With respect to GSLs under the HEA and FFELP, 34 Code of Federal Regulations § 682.411, as amended, contains the required collection procedures and activities. At the outset of the

---

[11] For example, there is nothing inherently wrongful about contacting a debtor after he or she is represented by counsel; is it unlawful because the Legislature has chosen to prohibit it on a public policy basis. On the other hand, using abusive or harassing methods or misrepresentations to attempt to collect a debt is, under any construction, wrongful conduct.

12

required collection practices, subsection (a) states that a lender is required to "engage in *at least* the collection efforts" described therein. (emphasis added). The remainder of the regulation describes certain activity which is required—depending on how delinquent a loan is—and includes required written collection notices, telephone contacts, and warnings of garnishment or offset proceedings, among other collection activities. Importantly, subsection (o) provides that "[t]he provisions of this section[] [p]reempt any State law, including State statutes, regulations, or rules, that would conflict with or hinder satisfaction of the requirements or frustrate the purposes of this section[.]"

Moreover, the Department of Education issued a "Notice of Interpretation" regarding required collection activities, which states that "these regulations preempt State law regarding the conduct of these loan collection activities." Stafford Loan, Supplemental Loans for Students, PLUS, and Consolidation Loan Programs, 55 Fed. Reg. 40120, 1990 WL 351708 (October 1, 1990). The Notice expressly states that the collection regulations contained in "34 CFR 682.411 preempt State law, including State case law, statutes and regulations that are inconsistent with the provisions of these GSL regulations." *Id*. In fact, the Notice specifically discusses claims made under State law for communications with a borrower after the servicer is notified that the borrowers are represented by counsel, advising that such claims are preempted. *Id*.

Based on the foregoing, this Court finds it clear that petitioner's claim for violation of the WVCCPA for continued communication with her after she advised she

13

was represented by counsel is preempted by federal law. The FFELP regulations require a lender to make "forceful" contacts with a borrower, with no exception for borrowers represented by counsel. Moreover, the Notice of Interpretation specifically addresses this situation—a state law claim for contacting a borrower after representation—and states that it is preempted. As described above, it is critical to note that a lender may not avail itself of relief provided by the guarantor unless the required regulatory contacts have been made. Likewise, a guarantor may not avail itself of the reinsurance by the Department of Education unless these efforts have been made. It is therefore an impossibility to comply with the regulations without running afoul of the WVCCPA in this regard. *Accord Martin,* 2007 WL 118417 at *9 (finding that WVCCPA claim based on post-representation telephone contact was preempted because regulations require such contact); *see also Cliff,* 363 F.3d at 1127 (noting that regulations promulgated under HEA may require lenders to complete a series of contact which are prohibited by a state consumer credit act). Accordingly, we hold that a claim pursuant to West Virginia Code § 46A-2-128(e) for unlawful communications regarding a debt is preempted by the federal regulations governing administration of Federal Family Education Loan Program loans as set forth in Title 34, Part 682 of the Code of Federal Regulations.

B. *Preemption of West Virginia Code § 46A-2-127(d) for False Representation of Character, Extent, or Amount*

We turn next to petitioner's claim pursuant to West Virginia Code § 46A-2-127(d) prohibiting the "false representation" of the "character, extent, or amount" of a

14

debt to determine if it is preempted by federal law. The Eleventh Circuit has had occasion to examine the preemptive effect of the FFELP regulations on a similar provision in Florida's Consumer Collection Practices Act.

In *Cliff*, the loan servicer garnished the borrower's wages for failure to make payments under a rehabilitation agreement. 363 F.3d at 1117-18. The borrower brought suit alleging violation of the FDCPA, including an allegation that the loan servicer "falsely represent[ed] the character, amount or legal status" of the debt, and the Florida Consumer Collection Practices Act prohibiting enforcement of a debt that is "not legitimate." *Id*. at 1118 n.4 (citing Fla. Stat. §559.72(9)). The Eleventh Circuit rejected wholesale preemption of state consumer protection claims observing that "many provisions of state consumer protection statutes do not conflict with the HEA or its regulations, and many state law provisions . . . actually complement and reinforce the HEA." *Id*. at 1130. In addressing a similar violation as that alleged herein, the *Cliff* court reasoned that

> [f]or us to conclude that this provision of the Florida Act [prohibiting enforcement of non-legitimate debts] hinders the completion of the sequence of collection activities, we would have to first conclude that the regulations require a third-party debt collector to attempt to collect a debt that it knows is not legitimate or to assert the existence of a legal right that it knows does not exist. We are certain that the HEA and its regulations do not contemplate third-party debt collectors attempting to collect debts that are not legitimate or asserting rights that do not exist.

15

*Id.* at 1129. *See also Bible*, 799 F.3d at 654 (rejecting preemption where borrower's state law claim was "not attempting to require more of the defendant than was already required by the HEA and its regulations"); *Coll. Loan Corp.*, 396 F.3d at 598 (rejecting argument permitting lender to "enter into a contract that invoked a federal standard as the indicator of compliance, then to proceed to breach its duties thereunder and to shield its breach" through preemption).

We find the Eleventh Circuit's reasoning compelling. There would appear to be nothing which would conflict with or frustrate the requirements and purposes of the HEA and FFELP by also precluding under State law, making a "false representation" about the "character, extent or amount" of a debt. While certain due diligence collection activities are required by the FFELP regulations, making "false representations" about the nature of a debt is certainly not one of them. We therefore find that the circuit court erred in concluding that this claim was federally preempted.

C.     *Viability of Petitioner's Claim for "False Representation" of the Debt*

Having determined that petitioner's claim pursuant to West Virginia Code § 46A-2-127(d) is not federally preempted, we nonetheless find it appropriate to determine whether such claim survives summary judgment.[12] As noted above, petitioner contends

---

[12] *See Gentry v. Mangum*, 195 W. Va. 512, 519, 466 S.E.2d 171, 178 (1995) ("[I]t is permissible for us to affirm the granting of summary judgment on bases different or grounds other than those relied upon by the circuit court.").

16

that her loan was "invalid" and/or "unenforceable" at the outset because it was subject to discharge and therefore any collection action on the loan was tantamount to a "false representation" as to the "character, extent, or amount" of the debt. In response, PHEAA maintains that petitioner's loan was, at best, potentially dischargeable pursuant to the administrative remedies provided under the FFELP. PHEAA further contends that it was merely the loan servicer and therefore unaware that the loan was subject to a blanket discharge. To analyze the viability of petitioner's claim, an overview of petitioner's attempts at obtaining discharge relief from the debt, along with a discussion of the discharge provisions under federal regulations, is helpful.

With respect to loan discharges, 34 Code of Federal Regulations § 682.402, as amended, outlines the requirements for a discharge of a GSL for death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments. Petitioner attempted to obtain discharges in this case on three separate bases: disability, false certification due to identity theft,[13] and false certification due to lack of "ability to benefit."

---

[13] The record is unclear regarding the circumstances under which petitioner contends her identity was stolen. At times, the record below indicates that petitioner suggested that her identity was stolen by someone in Florida. However, petitioner likewise ardently insists that the indictment and conviction of a Florida Federal Savings & Loan officer for activities related to its GSL program in the early 1990s suggests that her loan documentation was falsified by the lender. The only "evidence" offered on this issue is an 11th Circuit reported case affirming the officer's conviction. *See U. S. v. Harmas*, 974 F.2d 1262 (11th Cir. 1992). However, this case plainly reveals that the (continued . . .)

Section 682.402(c) governs discharges for "total and permanent disability." At the time of petitioner's disability discharge application, section 682.402(c)(2) (2010) provided that to obtain such a discharge, "[t]he borrower must submit to the Secretary an application for a total and permanent disability discharge on a form approved by the Secretary" which must contain "[a] certification by a physician . . . that the borrower is totally and permanently disabled[.]" Although petitioner bemoans the inadequacy of PHEAA's response to her attempts to obtain relief from the loan, there seems to be no dispute that petitioner failed to complete the application process, submitting only her social security disability decision, but no physician's statement.

---

officer engaged in activities designed to falsify *collection* activities on delinquent loans, rather than falsifying loan documents themselves.

Moreover, it is unclear whether petitioner even continues to maintain this position. *See* n.3 *supra*. In her discharge application for false certification of "ability to benefit" which petitioner signed under penalty of perjury, she avers that she either received the loan proceeds or they were paid for her benefit. Regardless, however, like her non-compliant attempt at obtaining a disability discharge, it is undisputed that petitioner did not establish identity theft in the manner required by the regulations.

To receive an identity theft-based "false certification" discharge, the borrower's sworn statement must certify that the borrower did not sign the promissory note, did not receive the loan proceeds, and must include a copy of a "local, State, or Federal court verdict or judgment that conclusively determines that the individual who is named as the borrower of the loan was the victim of a crime of identity theft[.]" § 682.402(e)(3)(v)(A) through (C). If no such judicial determination is available, the borrower may submit "[a]uthentic specimens of the signature of the individual" and "[a] statement of facts that demonstrate, to the satisfaction of the Secretary, that eligibility for the loan in question was falsely certified as a result of the crime of identity theft[.]" § 682.402(e)(3)(v)(D)(1) and (2). As noted above, it was determined that the handwriting specimens given were consistent. Moreover, given petitioner's refusal to make out a police report for fear of penalty for a false report, she did not complete the required steps to receive such a discharge.

18

A "false certification" discharge works similarly. "[F]alse certification" under the regulations includes situations where an individual did not have the "ability to benefit" from the training or education because he or she did not meet the applicable requirements. §§ 682.402(e)(1)(i)(A).[14] The latter constitutes the basis upon which petitioner applied for and was granted a discharge in the case *sub judice*. Section 682.402(e)(3) plainly states as follows with regard to the steps required of a borrower to qualify for an "ability to benefit" discharge:

> Except as provided in paragraph (e)(15) of this section, to qualify for a discharge of a loan under paragraph (e) of this section, the borrower *must submit to the holder of the loan a written request and a sworn statement . . . under penalty of perjury . . . .*

(emphasis added). The sworn statement must aver that the borrower "[r]eceived . . . the proceeds of any disbursement of a loan disbursed" and "did not meet the applicable requirements for admission on the basis of ability to benefit . . . ." § 682.402(e)(3)(ii)(A) and (B). [15] Students enrolled prior to July 1, 1987, were deemed to have the "ability to

---

[14] 20 U.S.C. § 1087(c) (2010) provides:

> If a borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and . . . if such student's eligibility to borrow under this part was falsely certified by the eligible institution or was falsely certified as a result of a crime of identity theft, or if the institution failed to make a refund of loan proceeds which the institution owed to such student's lender, then the Secretary shall discharge the borrower's liability on the loan

[15] An exception to the necessity of a discharge application exists under section 682.402(e)(15), providing for "[d]ischarge without an application":
(continued . . .)

benefit" if they had a high school diploma, GED, or satisfied criteria adopted by the lending institution to determine if the student had the ability to benefit.  34 C.F.R. § 682.402(e)(13)(ii)(A); 34 C.F.R. § 668.4-668.6 (1986).[16]

What the foregoing demonstrates quite clearly is that although a GSL may ultimately be subject to discharge, it is incumbent upon the borrower to apply for such discharge and provide the requisite information to substantiate the discharge.[17]  These requirements apply to a discharge on any basis—including a false certification "ability to benefit" discharge.  The regulations contain no exceptions for loans subject to a "blanket discharge" and, in fact, the discharge petitioner ultimately obtained pursuant to the

---

> A borrower's obligation to repay all or a portion of an FFEL Program loan may be discharged without an application from the borrower if the Secretary, or the guaranty agency with the Secretary's permission, determines that the borrower qualifies for a discharge *based on information in the Secretary or guaranty agency's possession.*

(emphasis added).  Petitioner does not argue, nor does the appendix record establish, that this regulation entitled her to a discharge without application.

[16] Even if they met these criteria, however, students were deemed not to have the "ability to benefit," if because of a "physical or mental condition, age, or criminal record" they were unable to meet the requirements for employment in their State of residence in the occupation for which the training program was intended.  34 C.F.R. § 682.402(e)(13)(iii)(B).

[17] Therefore, contrary to petitioner's apparent belief, the "blanket discharge" did not serve to void the borrowers' loans *ab initio*.  Rather, to the extent a borrower falls within this "blanket" time period of attendance at PTC Institute, his or her burden of proof of false certification is mitigated and, upon proper application containing the required averments, he or she is entitled to discharge.

20

blanket discharge was administered precisely as the regulations contemplate. Accordingly, petitioner's foundational argument upon which her claim for "false representation" is premised is fatally flawed. Petitioner's loan was neither "invalid" nor "unenforceable," but rather, subject to discharge upon compliance with the regulations. Although petitioner made such a claim for discharge and completed the discharge process as prescribed in the regulations, until that occurred, her loan remained enforceable and subject to the collection efforts mandated by the regulations. As for petitioner's multiple, incomplete or aborted *attempts* to obtain a discharge, PHEAA was not relieved of its regulatory collection obligations simply because petitioner raised the specter of a potential discharge.[18] Therefore, petitioner has failed to identify a "false representation" made by PHEAA regarding the loan based on its eligibility for discharge.

As to PHEAA's actual knowledge of the blanket discharge, the undisputed material facts establish that PHEAA was merely the loan servicer and did not originate

---

[18] Duties which arise upon receipt of *reliable* information suggesting a borrower may be discharge-eligible are outlined in section 682.402(e)(12), which provides that

> if the lender is notified by a guaranty agency or the Secretary, or receives information *it believes to be reliable* from another source indicating that a current or former borrower may be eligible for a discharge under paragraph (e) of this section, the lender shall immediately suspend any efforts to collect from the borrower . . . [and] inform the borrower of the procedures for requesting a discharge.

(emphasis added). However, if the borrower fails to avail herself of the discharge process, collection "shall resume." § 682.402(e)(12)(ii).

21

the loan, nor did SunTrust Bank, with whom PHEAA contracts. The loan was sold in a bundle of loans from the federal government as "rehabilitated" loans, *i.e.* loans that were once in default, but payments had been resumed. Moreover, as petitioner herself notes, the agreement between the Department of Education and SunTrust Bank purportedly governing sale of petitioner's promissory note represents that the loans being sold were "eligible for guarantee." That is to say, the rehabilitated loans were valid and capable of being reimbursed by the guarantor, upon default, pursuant to 34 C.F.R. 682.401(b)(5) ("The guaranty agency shall guarantee . . . 100 percent of the unpaid principal balance of each loan guaranteed for loans disbursed before October 1, 1993"). Moreover—again, as argued by petitioner—the governing regulations provide that rehabilitated loans are based upon "enforceable" promissory notes. As a rehabilitated loan sold pursuant to the regulations and the agreement with the Department of Education, there is nothing which would suggest to PHEAA that the loan was based upon anything other than a valid, enforceable note, eligible for guarantee. Therefore, rather than supporting petitioner's position, these items merely reinforce her lack of proof that PHEAA knew that the loan was potentially dischargeable and that their collection efforts were effectively a "false representation" about the loan.

In fact, the only purported indicia of PHEAA's knowledge of the blanket discharge contained in the appendix record is unauthenticated letters in an unrelated matter by and between an attorney for various unknown individuals, the Department of Education, and PHEAA from 1995 regarding the PTC Institute blanket discharge as

22

pertained to those individuals' loans. The source of these letters is unknown and it is wholly unclear whether these letters were properly part of the record below. However, even assuming that this tenuous evidence establishes that PHEAA was *institutionally* "on notice" of the PTC Institute blanket discharge, petitioner has failed to adduce any evidence that PHEAA knew, at the time of its collection efforts, that petitioner attended PTC Institute. At a minimum, before this Court, petitioner has failed to demonstrate an issue of fact as to whether PHEAA had institutional knowledge that petitioner's loan was potentially subject to discharge under the PTC Institute blanket discharge. As PHEAA points out, it received only the promissory note underlying the loan for purposes of servicing the loan and the promissory note contained in the appendix record does not contain the name of the educational institution for which the loan funds were utilized. It is well-established that evidence of a promissory note alone is sufficient to establish a prima facie obligation. *See U. S. v. Irby*, 517 F.2d 1042 (5th Cir. 1975).

Accordingly, we find that petitioner has failed to demonstrate that PHEAA made any false representation about the character, extent, or amount of her loan as prohibited by West Virginia Code § 46A-2-127(d). As this Court has made clear many times, "the party opposing summary judgment must satisfy the burden of proof by offering more than a mere 'scintilla of evidence.'" *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 60, 459 S.E.2d 329, 337 (1995) (quoting *Anderson v. Liberty Lobby*, *Inc.,* 477 U. S. 242, 252 (1986)). Further, "a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that

23

party." Syl. Pt. 5, in part, *Jividen v. Law*, 194 W. Va. 705, 708, 461 S.E.2d 451, 454 (1995). To create a trialworthy issue, "the non-moving party [must] point to one or more disputed 'material' facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law." *Id*. Given that petitioner has failed to adduce evidence of a triable issue regarding whether PHEAA made a false representation regarding her loan, summary judgment is appropriate.[19]

## IV. CONCLUSION

For the reasons stated herein, we therefore affirm the circuit court's February 3, 2015, order.

Affirmed.

---

[19] Petitioner also argues, at length, that the rehabilitation agreement does not qualify as a "novation" such as to "save" the "invalid loan." This argument is immaterial because petitioner has failed to establish that the loan was "invalid" at any pertinent point in time. The rehabilitation agreement, which occurred before PHEAA's involvement in the loan, is therefore irrelevant to the analysis. Additionally, petitioner argues that her admissions about receipt of the loan proceeds in the application for discharge should not be considered because the application is a "contract of adhesion" which is "unconscionable." Although it is highly questionable whether the discharge application constitutes a contract to which an unconscionability analysis would apply, our resolution of this matter is not dependent upon the admissions contained therein and therefore, we decline to address this issue further.